IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | | |
|---|---|---|
| HDI GLOBAL SPECIALTY SE, | * | |
| Plaintiff/Counter-Defendant, | * | |
| vs. | * | |
| PF HOLDINGS, LLC, *et al.*, | * | |
| Defendants/Counter-Plaintiffs/ Third-Party Plaintiffs, | * | |
| | * | CASE NO. 4:20-CV-103 (CDL) |
| vs. | * | |
| HDI GLOBAL SPECIALTY SE and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, | * | |
| | * | |
| Counter-Defendants/Third- Party Defendants. | * | |

O R D E R

The pending summary judgment motions in this liability insurance coverage dispute require the Court to decide the following issues: (1) did the liability insurance carrier for the additional insureds in the underlying litigation breach its duty to provide the insureds with a defense? (2) if it did not, did the insureds breach their duties under the applicable policies to cooperate with the insurance carrier in the defense of the claims and/or to avoid binding the insurance carrier to a legal judgment without the insurance carrier's consent or input? (3) if they did, did the insurance carrier waive these duties owed by its

insureds? (4) regardless of the resolution of the foregoing issues, did the insurance carrier breach its duty of good faith it owed to its insureds when it did not accept the settlement demands that were within its insureds' policy limits? For the reasons explained in the remainder of this Order, the Court answers these questions "no," "yes," "no," and "no," respectively. Thus, the insurance carrier is entitled to a declaration that it has no insurance coverage for the substantial arbitration judgment that was entered on the underlying claims, nor does it have any liability for its refusal to accept the settlement demands. Accordingly, the summary judgment motions of National Union Fire Insurance Company of Pittsburgh, PA and HDI Global Specialty SE (ECF Nos. 68 & 69) are granted to the extent described in this Order, and the summary judgment motion of the other parties (ECF No. 67) is denied. The Clerk shall enter final judgment in favor of HDI Global Specialty SE and National Union Fire Insurance Company of Pittsburgh, PA.

### SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing

summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

FACTUAL BACKGROUND

This is a declaratory judgment action arising from an insurance coverage dispute regarding the entry of a substantial judgment on an arbitration award. In the underlying tort action, two residents of an apartment complex ("The Ralston") sued the four entities that owned, ran, managed, and controlled the complex. The Ralston provided Section 8 housing for disabled and elderly individuals, including Jennifer Glaubius and Phillip Hadley ("Claimants"). Claimants alleged that poor living conditions persisted at The Ralston for years: their apartments lacked heat in the winter and air conditioning in the summer, they suffered roach and bed bug infestations, and they were displaced from their apartments for several days one winter when the heat and hot water at The Ralston failed. Claimants sent pre-suit settlement demands to all four Ralston entities, then filed a civil action against them in state court after those demands were rejected.

Two of the entities responsible for the apartments, Ralston GA, LLC and PF Ralston, LLC, were named insureds under a general liability insurance policy issued by HDI Global Specialty SE (formerly known as International Insurance Company of Hannover SE) and an excess policy issued by National Union Fire Insurance Company of Pittsburgh, PA.  The other two entities—PF Holdings, LLC and Schoolhouse Road Estates, Inc.—were not named insureds under the policies.  The policies, though, provide that the members of a named insured limited liability company "are also insureds, but only with respect to the conduct of [the LLC's] business."  Am. Compl. Ex. A, HDI 2017-2018 Policy Form CG 00 01 04 13 § II.1.c, ECF No. 48-1 at 31; Answer & Countercl. Ex. 7, Nat'l Union 2018 Excess Policy Form AH2711 § VII.N.2.c, ECF No. 14-9 at 30.  The policies further state that an organization "while acting as [the named insured's] real estate manager" is also an insured.  HDI 2017-2018 Policy Form CG 00 01 04 13 § II.2.b, ECF No. 48-1 at 32; Nat'l Union 2018 Excess Policy Form AH2711 § VII.N.5, ECF No. 14-9 at 30.  Thus, Schoolhouse, which was the sole member of Ralston GA and PF Holdings, which managed The Ralston, were additional insureds under the policies.[1]

---

[1] Defendants presented evidence that Schoolhouse was Ralston GA's direct controlling entity.  Defs.' Mot. for Summ. J. Ex. 17, IRS Form 990, ECF No. 67-19.  HDI denies that Schoolhouse was the direct controlling entity of Ralston GA at all relevant times, but it did not point to evidence to create a genuine fact dispute on this point.

HDI, the primary insurer, provided a defense for the named insureds shortly after receiving notice of the claims, subject to a reservation of rights, but it was not explicitly asked to provide a defense for the additional insureds and did not immediately do so.  After the additional insureds explicitly asked HDI to provide a defense, HDI eventually offered to defend them subject to a reservation of rights.  The additional insureds objected to the reservation of rights and continued to be represented by the lawyer they personally retained to represent them.  Claimants offered to settle their claims within the combined policy limits of the primary and excess insurers, and the insurers rejected those offers.  Claimants agreed to dismiss their claims against the named insureds and arbitrate their claims against the additional insureds.  The arbitrator found in favor of Claimants and against the additional insureds, awarding significant compensatory damages, punitive damages, and attorneys' fees under O.C.G.A. § 13-6-11.

Before the arbitration hearing, HDI filed this declaratory judgment action in this Court against Claimants and the four Ralston Entities, seeking a declaration that it has no duty to defend or indemnify PF Holdings and Schoolhouse as a matter of law because those insureds breached their duties under the

policies.[2]   Defendants were notified of this action before the
arbitration proceedings.   The Ralston Entities and Claimants, to
whom the Ralston Entities assigned all assignable rights and
claims against the insurers, brought counterclaims against HDI
and a third-party complaint against excess insurer National
Union.   They assert that PF Holdings and Schoolhouse, as
additional insureds, are entitled to coverage under the policies,
that HDI breached its duty to defend them, and that both insurers
acted unreasonably when they rejected Claimants' settlement
demands.

### DISCUSSION

There are three summary judgment motions pending before the
Court, and they present four main issues.  First, did the primary
insurer breach its duty to defend the additional insureds?
Second, did the additional insureds breach their duties under the
primary insurance policy?  Third, did the primary insurer waive
its right to insist upon the additional insureds' compliance with
the terms of its policy? And fourth, did the insurers act in bad
faith when they rejected Claimants' settlement demands?   The
Court addresses each issue in turn.

---

[2] Based on the Court's review of the operative complaint, HDI does not
seek any relief against PF Ralston or Ralston GA.   Claimants initially
asserted claims against PF Ralston and Ralston GA in the underlying
tort action, but Claimants moved to dismiss those claims without
prejudice and the state court granted that motion on April 6, 2020.

**I.   Did HDI Deny the Additional Insureds a Defense?**

There is no serious dispute at this time that Schoolhouse and PF Holdings were additional insureds under the HDI and National Union policies.  The HDI policy states that HDI will provide a defense for a suit against the insured for a covered claim.  2017-2018 HDI Policy Form CAS 14 66 07 17, ECF No. 48-1 at 55.  For purposes of the present motion, HDI does not deny that Claimants' claims against PF Holdings and Schoolhouse were arguably covered under the HDI policies.  HDI does contend, though, that it never denied the additional insureds a defense because its duty to defend was not triggered until the additional insureds clearly requested a defense on January 23, 2020, and it offered a defense within a month after receiving the request. Defendants assert that HDI's duty to defend was triggered before January 23, 2020 and that HDI unambiguously denied PF Holdings and Schoolhouse a defense in early January 2020.  Defendants therefore maintain that after this alleged denial of coverage, the additional insureds had no further duty to comply with the terms of the HDI policy that required them to cooperate with HDI in the defense of the claims and to avoid subjecting HDI to any liability without HDI's consent.

A.   Relevant Facts

Claimants sent pre-suit settlement demands to Ralston GA, PF Ralston, PF Holdings, and Schoolhouse through Chaim Puretz in

September 2019.  Puretz also received an email from his lawyer in a separate action recommending that Puretz send the demand letters to his insurance company.  Puretz forwarded that email to his insurance broker, with no additional message except a question mark.  Defs.' Mot. for Summ. J. Ex. 47, Email from C. Puretz to S. Breier (Oct. 12, 2019, 8:37 PM), ECF No. 67-49.  The emails do not mention PF Holdings or Schoolhouse.

Claimants' counsel sent a pre-suit demand letter to HDI and National Union.  Am. Compl. Ex. E, Letter from C. Gower to Int'l Ins. Co. of Hannover SE, *et al.* (Oct. 28, 2019), ECF No. 48-5. The letter stated that counsel understood that HDI was the insurer for PF Ralston LLC and Ralston GA LLC between December 28, 2017 and December 28, 2019 and that he understood that National Union was the excess insurer during this period.  *Id.* at 1.  The letter also stated, in a footnote: "Schoolhouse Road Estates, Inc., is the sole member of Ralston GA LLC," "PF Holdings LLC manages the Ralston Towers," and the policies should thus cover PF Holdings and Schoolhouse.  *Id.* at 1 n.1.

HDI's adjuster emailed Puretz at his "pfholdingsllc.com" email address on October 31, 2019.[3]  Defs.' Mot. for Summ. J. Ex. 8, Email from V. Goldin to C. Puretz (Oct. 31, 2019, 4:45 PM), ECF No. 67-10 at 2.  That email states that HDI insured PF

---

[3] The adjuster, Veronica Goldin, was an adjuster with HDI's third-party administrator North American Risk Services.

8

Ralston and Ralston GA on the Glaubius and Hadley claims. It does not mention PF Holdings or Schoolhouse. On December 3, 2019, HDI appointed Bradley Wolff as defense counsel for PF Ralston and Ralston GA, subject to a reservation of rights.

The Ralston Entities' insurance broker requested status updates on Claimants' claims twice in December 2019. The requests mentioned PF Ralston and Ralston GA, but not PF Holdings or Schoolhouse. Defs.' Mot. for Summ. J. Ex. 48, Broker Inquiry (Dec. 5, 2019, 6:03 PM), ECF No. 67-50 at 2; Defs.' Mot. for Summ. J. Ex. 60, Email from J.R. to V. Goldin (Dec. 30, 2019, 1:46 PM), ECF No. 67-62. The adjuster responded to both requests. In her first response, the adjuster stated that she received the demand letter, that defense counsel had been assigned, and that the broker should call the adjuster with questions or concerns. Defs.' Mot. for Summ. J. Ex. 48, Email from V. Goldin to JR (Dec. 6, 2019, 8:21 AM), ECF No. 67-50 at 5. In her second response, the adjuster said that HDI was "handling the claim under a Reservation of Rights" and had "referred the defense to Bradley Wolff." Defs.' Mot. for Summ. J. Ex. 60, Email from V. Goldin to J.R. (Jan. 2, 2020, 9:38 AM), ECF No. 67-62. Both responses stated that the insureds were PF Ralston and Ralston GA. Neither the broker's requests nor the adjuster's responses mentioned PF Holdings or Schoolhouse.

HDI's adjuster sent Puretz a reservation of rights letter on December 18, 2019, listing the insureds as PF Ralston and Ralston GA.  Defs.' Mot. for Summ. J. Ex. 11, Letter from V. Goldin to C. Puretz 1 (Dec. 18, 2019), ECF No. 67-13.  The adjuster advised Puretz to notify HDI in writing if the letter contained errors of fact or law or if there were any additional relevant facts. Jason Crawford, the Ralston Entities' personal counsel on another matter, was copied on the letter.  The letter did not mention PF Holdings or Schoolhouse.  No one responded to the letter.

Claimants filed civil actions against Ralston GA, PF Ralston, PF Holdings, and Schoolhouse on December 23, 2019. Claimants alleged that PF Holdings managed The Ralston and that Schoolhouse was "the sole member and direct controlling entity of Ralston GA" and was responsible for a recent "rehabilitation" of The Ralston.  Am. Compl. Ex. C, Hadley Compl. ¶¶ 2-6 (Muscogee Cnty., Ga. State Ct. Dec. 23, 2019), ECF No. 48-3; Am. Compl. Ex. D, Glaubius Compl. ¶¶ 2-6 (Muscogee Cnty., Ga. State Ct. Dec. 23, 2019), ECF No. 48-4.

Upon receiving a letter from Claimants' counsel regarding service, HDI's adjuster authorized Wolff to accept service on behalf of PF Ralston and Ralston GA, but she stated that the "carrier does NOT insure PF Holdings Inc or Schoolhouse Road Estates Inc, so we will not provide a defense to them."  Defs.' Mot. for Summ. J. Ex. 14, Email from V. Goldin to B. Wolff (Jan.

3, 2020, 3:31 PM), ECF No. 67-16.  On January 6, 2020 Wolff sent
Puretz a letter stating that he had been retained to represent PF
Ralston and Ralston GA in the underlying lawsuits.  Puretz Dep.
Ex. 5, Letter from B. Wolff to C. Puretz (Jan. 6, 2020), ECF No.
69-3 at 49.  Wolff noted that he had not been asked to represent
PF Holdings or Schoolhouse.  *Id.*  Around the same time, Wolff
advised Puretz to get his own attorney to represent PF Holdings
and Schoolhouse.  Puretz Dep. 73:2-15, ECF No. 67-53.  Neither
HDI nor the adjuster explicitly communicated to Puretz that HDI
was denying a defense to PF Holdings and Schoolhouse.  *Id.* at
112:5-13.

At some point, Puretz contacted Crawford to seek help.  On
January 23, 2020, Crawford sent an email to HDI's adjuster,
asking that HDI provide a defense to PF Holdings and Schoolhouse
in the Glaubius and Hadley lawsuits.  Goldin Dep. Ex. 16, Email
from J. Crawford to V. Goldin (Jan. 23, 2020, 3:39 PM), ECF No.
69-7 at 20.  The email clearly described the relationship between
the various Ralston Entities and explicitly sought a defense for
PF Holdings and Schoolhouse, explaining that they were additional
insureds under the HDI policy because Ralston GA hired PF
Holdings to be the real estate manager for The Ralston and
Schoolhouse was a member of Ralston GA.  The January 23, 2020
email was the first time an explicit request was made for HDI to
provide a defense for PF Holdings and Schoolhouse.  Puretz Dep.

83:9-84:25, ECF No. 69-3 (stating that Puretz did not personally request a defense for PF Holdings or Schoolhouse and that he did not know if his lawyer explicitly requested a defense for these entities before January 23, 2020).[4]  Crawford followed up with more emails providing documentation of the connection between PF Holdings, Schoolhouse, and The Ralston.

### B.   Analysis

Defendants argue that HDI denied a defense to PF Holdings and Schoolhouse by early January 2020.  And therefore, HDI is on the hook for the judgment entered on the arbitration award, even if PF Holdings and Schoolhouse's agreement to the arbitration and their failure to cooperate violated their duties under the policy.  It is well-established under Georgia law that "an insurer that denies coverage and refuses to defend an action against its insured, when it could have done so with a reservation of its rights as to coverage, waives the provisions of the policy against a settlement by the insured and becomes bound to pay that amount of any settlement within a policy's limits made in good faith, plus expenses and attorney's fees if

---

[4] Defendants dispute this fact, pointing to evidence that HDI's adjuster knew that Puretz was the contact person for all four Ralston entities, including PF Holdings and Schoolhouse.  Defendants note that Puretz, used a "pfholdingsllc.com" email address to communicate with the adjuster.  But Defendants did not point to evidence that PF Holdings or Schoolhouse explicitly requested a defense from HDI before January 23, 2020.  Given the lack of clarity as to the relationship between the various Ralston Entities prior to the January 23 email, the Court finds that no clear and explicit request was made for defense of the additional insureds until that time.

the claim is actually covered by the policy." *Owners Ins. Co. v. Smith Mechanical Contractors, Inc.,* 683 S.E.2d 599, 602 (Ga. 2009) (alterations adopted) (quoting *S. Guar. Ins. Co. v. Dowse,* 605 S.E.2d 27, 29 (Ga. 2007)).  PF Holdings and Schoolhouse argue that this principle also excused them from cooperating under the terms of the policy.  Their challenge here is establishing that HDI's conduct amounted to a denial of coverage and a refusal to defend as contemplated by this principle of Georgia law.  In the above cited cases relied upon by Defendants, the insurers clearly and unequivocally denied coverage.  A careful examination of the circumstances here does not support a similar conclusion.

In the present case, PF Holdings and Schoolhouse were not *named* as insureds under the HDI policy.  Although the principle cited above obviously also applies to *additional* insureds, this difference in insured status cannot be ignored in the analysis. And Georgia law recognizes this distinction.  In Georgia, an additional insured under an insurance liability policy generally must elect coverage offered by the policy.  *Adwater v. Georgia Ins. Co.*, 316 S.E.2d 2, 5 (Ga. Ct. App. 1984); *accord Starnes v. Cotton States Mut. Ins. Co.*, 390 S.E.2d 419, 421 (Ga. Ct. App. 1990).  To elect coverage, an unnamed additional insured who is sued as a defendant in an action for damages may forward a copy of the complaint and summons to the insurer.  *Adwater*, 316 S.E.2d at 5.  It is not enough for the insurer, however, to receive

13

notice by someone other than the purported insured. *Id.* In *Adwater*, for example, a subcontractor who was an additional insured on the contractor's liability policy did not elect coverage under the policy, and the Georgia Court of Appeals found that the notice provided to the insurer by the other insureds "did not eliminate the necessity" of the subcontractor electing coverage, thus communicating to the insurer that it expected coverage. *Id.*[5]

Defendants argue that HDI unambiguously denied a defense to PF Holdings and Schoolhouse by early January 2020, when Wolff advised Puretz that he had been hired to represent PF Ralston and Ralston GA but not PF Holdings or Schoolhouse. Defendants valiantly try to avoid the application of the well-established principle under Georgia law that to trigger the duty to defend, an additional insured must elect coverage, and it is not enough for the insurer to receive notice by someone other than the purported insured. *Adwater*, 316 S.E.2d at 5. They argue that because HDI was on notice of the *claims* against all four Ralston

---

[5] In some cases, an election of coverage can be implied if the facts support it and the absence of an express election will not prejudice the insurer, as in actions against an employer and employee based on the employee's conduct where the employer is the named insured, the employee is an additional insured, and their interests do not conflict. *See, e.g.*, *Leventhal v. Am. Bankers Ins. Co. of Fla.*, 283 S.E.2d 3, 5-6 (Ga. Ct. App. 1980) (concluding that an employee was covered as an additional insured because there was "no question . . . of a reluctant insured," the insurer had immediate notice of the claim, and the defense of the named insured employer merged with a defense of the additional insured employee). This is not such an action.

Entities, HDI must have been on notice that PF Holdings and Schoolhouse were additional insureds who wanted a defense under the HDI policies.  Defendants point out that Claimants alleged in the underlying state court complaint facts to suggest that PF Holdings and Schoolhouse were additional insureds under the HDI policies.  Defendants boldly maintain that the evidence shows that coverage was clearly requested *on behalf of PF Holdings and Schoolhouse* before January 23, 2020.  It does not.

Defendants did not point to any evidence that the Ralston Entities or their broker forwarded the underlying complaints to HDI *on behalf of PF Holdings and Schoolhouse*.  These additional insureds were not specifically identified in the HDI policies. Defendants did not point to evidence that the broker requested coverage *for PF Holdings or Schoolhouse*, explained these entities' relationship to The Ralston, or sought to correct the adjuster's repeated assertions that the insureds were only PF Ralston and Ralston GA.  And they pointed to no authority that the duty to defend an additional insured is triggered under the facts here, where HDI simply knew that PF Holdings and Schoolhouse were defendants in the underlying actions and that Claimants alleged they were related to the named insureds. Accordingly, the Court finds that HDI's duty to defend PF Holdings and Schoolhouse was not triggered until Crawford clearly explained the relationship between the additional insureds and

the other Ralston Entities and explicitly requested a defense for them on January 23, 2020.

The Court further finds that under the circumstances, Defendants' assumption of the defense of PF Holdings and Schoolhouse after the duty to defend was triggered on January 23, 2020 was sufficiently prompt, and the delay did not constitute a denial of the request for a defense. The following evidence supports this conclusion. HDI's adjuster responded to Crawford's January 23 email two weeks after receiving it, acknowledging the request for a defense. Another week passed, and HDI assigned a new adjuster, who contacted Claimants' counsel to discuss the claims. The next week, HDI informed PF Holdings and Schoolhouse through counsel that HDI would assume their defense under a reservation of rights. Defs.' Mot. for Summ. J. Ex. 30, Email from P. Fields to J. Crawford (Feb. 21, 2020, 6:37 PM), ECF No. 67-32. About eighteen days after that, HDI notified Crawford that it had appointed counsel to defend PF Holdings and Schoolhouse subject to a reservation of rights. Defs.' Mot. for Summ. J. Ex. 34, Letter from P. Fields to J. Crawford (Mar. 10, 2020), ECF No. 67-36. Crawford, on behalf of PF Holdings and Schoolhouse, rejected HDI's conditions for a defense and took the position that HDI owed his clients an unconditional defense and forfeited the right to deny coverage in light of what he argued was their previous denial of coverage and a defense. Defs.' Mot.

for Summ. J. Ex. 37, Letter from J. Crawford to P. Fields (Mar. 16, 2020), ECF No. 67-39.   HDI refused to withdraw its reservation of rights.  It is important to understand the rights HDI reserved.  It reserved the right to contest coverage and to potentially change its mind about providing a defense, but it committed to providing PF Holdings and Schoolhouse with a defense to the underlying claims within approximately one month after the clear and explicit request for a defense.   Furthermore, PF Holdings and Schoolhouse were not required to waive any rights they may have by accepting the defense.  They retained the right to assert their coverage claims.  HDI, however, was simply making clear that by providing the defense, it was not waiving its right to contest coverage, a standard practice in insurance claims management which has been approved by Georgia courts.

The Court acknowledges that a prolonged delay in responding to a request for a defense, particularly when a clear request for a defense has been made and a duty to defend clearly exists, may under certain circumstances be deemed a refusal to provide a defense, but the circumstances here do not support that conclusion.  Although the relationships between the various targets in the underlying litigation and their connection to the alleged claims complicated the ultimate decision to provide a defense to the additional insureds, HDI ultimately, after investigation, made the correct decision to provide the

additional insureds with a defense, and the slight delay in doing so caused them absolutely no prejudice.

The law is not intended to lay traps for the unwary. The applicable legal principle seeks to prevent an insurer from "wholly abandon[ing] its insured and then attempt to shield itself with a no settlement clause if the claim was covered by the policy." *Trinity Outdoor, LLC v. Central Mutual Ins. Co.*, 679 S.E.2d 10, 13 (Ga. 2009). HDI's short delay in offering to defend the underlying tort action, which resulted in part from the failure of the additional insureds to explicitly request coverage earlier, certainly does not amount to an abandonment of those insureds. To hold otherwise would convert this reasonable principle of Georgia law into a "gotcha opportunity" for clever lawyers. Based on the foregoing, HDI is entitled to summary judgment on Defendants' counterclaim that HDI breached its duty to defend PF Holdings and Schoolhouse. That counterclaim is dismissed.

## II.  Did PF Holdings and Schoolhouse Breach Their Duties?

Having found that HDI did not breach its duty to defend PF Holdings and Schoolhouse, the next issue is whether PF Holdings and Schoolhouse complied with their duties under the HDI and National Union policies. Those duties include the duty to cooperate with HDI in their defense and the duty not to assume an obligation subjecting the insurers to liability without their

consent.   Analysis of these issues is complicated (or perhaps simplified) by PF Holdings and Schoolhouse's position (which the Court has found was erroneous) that they were excused from cooperating with HDI because they thought HDI had denied them a defense.   Thus, their conduct during the arbitration proceeding demonstrates a lack of cooperation as contemplated by the policy because they mistakenly believed they had no duty to cooperate. And they admittedly subjected HDI to the arbitration judgment without HDI's consent because they believed HDI had forfeited its right to insist upon compliance with that policy provision.   But once the Court determined that HDI had not breached its duty to defend for the reasons explained in the previous discussion-and thus did not forfeit its right to insist upon compliance with these policy terms—it is evident that PF Holdings and Schoolhouse, arguably by their own admission, breached their duties under the policy.   While it is tempting to end the discussion here, additional analysis may be helpful in discerning the Court's rationale.

A.   <u>Relevant Facts</u>

The HDI and National Union policies require the insureds to cooperate with the insurers in the investigation of a claim or defense against a suit.  2017-2018 HDI Policy Form CG 00 01 04 13 § IV.2.c, ECF No. 48-1 at 33; 2018 Excess Policy Form AH2711 § VI.G.3, ECF No. 14-9 at 26.   The HDI and National Union

policies also state that the insured shall not, except at the insured's own cost, "assume any obligation, or incur any expense," without the insurer's consent.  2017-2018 HDI Policy Form CG 00 01 04 13 § IV.2.d, ECF No. 48-1 at 33; *see* 2018 Excess Policy Form AH2711 § VI.G, ECF No. 14-9 at 26 (describing the same duty).

After PF Holdings and Schoolhouse demanded a defense but before they were notified that HDI would provide one, PF Holdings and Schoolhouse reached an agreement with Claimants to arbitrate their claims.  Defs.' Mot. for Summ. J. Ex. 32, Mem. of Agreement to Arbitrate, ECF No. 67-34.  They also agreed to have attorney Joe Waldrep arbitrate the matter.  Defs.' Mot. for Summ. J. Ex. 33, Letter from C. Gower to J. Waldrep (Feb. 25, 2020), ECF No. 67-35.  Neither PF Holdings nor Schoolhouse asked HDI or National Union for consent regarding the arbitration or the arbitrator. Crawford Dep. 49:17-50:9, ECF No. 67-55 (acknowledging that Crawford never asked for consent to the arbitration and that if he had believed HDI had agreed to defend his clients, Crawford would have consulted HDI).

In counsel's reservation of rights letters to PF Holdings and Schoolhouse, HDI raised several coverage issues and stated that HDI reserved "the right to withdraw and deny coverage in the event Schoolhouse or PF Holdings fails to comply with the cooperation conditions." *E.g.,* Defs.' Mot. for Summ. J. Ex. 40,

Letter from P. Fields to J. Crawford 7 (Mar. 30, 2020), ECF No.
67-42.   HDI also noted that nothing in "HDI's continuing
investigation and evaluation of this matter . . . shall
constitute a waiver or estoppel, either express or implied, of
any HDI's rights under the Policy." *Id.*   In its second
reservation of rights letter, HDI stated that it intended to file
a declaratory judgment action regarding its obligations to
Schoolhouse and PF Holdings. *Id.* at 2.

Before the arbitration hearing, HDI appointed David Mize to
defend PF Holdings and Schoolhouse, and Mize and another lawyer
with his firm, Pete Temesgen, attempted to assume their defense.
Crawford told Temesgen that he could observe but not actively
participate in the arbitration unless HDI withdrew the
reservation of rights.   Temesgen Dep. Ex. 118, Email from J.
Crawford to P. Temesgen (May 1, 2020, 1:47 PM), ECF No. 93-4 at
140.   Mize and Temesgen had conference calls and strategy
sessions with Crawford before the arbitration.   Crawford Dep.
51:17-25; *see also* Defs.' Mot. for Summ. J. Ex. 55, Email from P.
Temesgen to J. Moudy (May 4, 2020, 2:04 PM), ECF No. 67-57
(stating that Mize and Temesgen would prepare to participate in
the arbitration despite Crawford's email stating they "may
observe but not participate").

HDI contends that its appointed defense counsel *objected* to
the arbitration, but HDI did not point to evidence of their

express objection to the arbitration.[6]   Rather, HDI pointed to evidence that appointed defense counsel wrote Crawford a letter stating that his firm was available to help with the arbitration and that if Crawford wanted them to participate and not merely observe, then he asked that the arbitration be rescheduled to allow for appointed defense counsel to become familiar with the record.   Crawford Dep. Ex. 20, Letter from P. Temesgen to J. Crawford (May 7, 2020), ECF No. 69-9 at 59; *see also* Crawford Dep. Ex. 20, Letter from P. Temesgen to J. Crawford (May 14, 2020), ECF No. 69-9 at 60 (stating that Mize and Temesgen needed to know by May 15, 2020 whether Crawford would accept their assistance at the arbitration).   Neither Mize nor Temesgen ever expressly stated to anyone that HDI agreed to the arbitration. Mize Dep. 13:9-11, ECF No. 93-5; Temesgen Dep. 92:17-93:1, ECF No. 93-4.

In response to Temesgen's offer of assistance and request for the arbitration to be rescheduled, Crawford sent Temesgen an email stating that he would welcome the assistance of Mize and Temesgen only if HDI withdrew its reservation of rights. Crawford Dep. Ex. 20, Email from J. Crawford to P. Temesgen, *et al.* (May 14, 2020, 10:22 AM), ECF No. 69-9 at 61.   Crawford also stated that Schoolhouse and PF Holdings planned to go forward

---

[6] HDI did point out that its adjuster told Mize that Crawford could not enter binding arbitration without HDI's express consent.   Temesgen Dep. Ex. 116, Email from K. Skinner to D. Mize (Mar. 11, 2020, 3:35 PM), ECF No. 93-4 at 138.

with the arbitration on May 18, 2020 as scheduled. *Id.* Later
that day—the Thursday before the arbitration set for Monday—HDI
filed this declaratory judgment action, asserting among other
things that PF Holdings and Schoolhouse agreed to proceed to
arbitration over the objection of HDI's appointed defense counsel
and that PF Holdings and Schoolhouse breached their duty to
cooperate by refusing to allow appointed defense counsel to
participate in their defense and by agreeing to participate in
the arbitration "over the objection of HDI's appointed defense
counsel." Compl. ¶¶ 101, 107-108, ECF No. 1. Coverage counsel
forwarded a courtesy copy of the declaratory judgment complaint
to Crawford the same day, May 14, 2020. Pl.'s Suppl. Br. Ex. A,
Email from S. Swafford to J. Crawford (May 14, 2020, 6:13:52 PM),
ECF No. 93-1; Pl.'s Suppl. Br. Ex. C, Email from K. Burke to J.
Crawford (May 14, 2020, 6:48:41 PM), ECF No. 93-3.[7] So, to the
extent that HDI's position was previously unclear, the
declaratory judgment complaint made it crystal clear prior to the
arbitration hearing that HDI did not consent to the arbitration
going forward and that it insisted on allowing the counsel it

---

[7] Certain facts, including whether Defendants received notice of the
declaratory judgment action before the arbitration hearing and the
extent of appointed counsel's involvement in the arbitration
proceeding, were not clear from the record or from the hearing on the
summary judgment motions. The Court permitted supplemental briefing
following targeted discovery on the issue, and this section references
the evidence cited in the supplemental briefs.

retained to represent the additional insureds to actively
participate in the arbitration proceedings.

HDI's demands were largely ignored. The arbitration hearing
took place on May 18, 2020. Crawford handled the defense for PF
Holdings and Schoolhouse. Mize and Temesgen attended the
arbitration and suggested questions during the breaks but did not
otherwise participate. Crawford Dep. 51:17-25. The arbitrator
issued an initial post-trial order on June 16, 2020, announcing
his preliminary decision to enter an award in favor of Claimants
on several claims. The arbitrator held oral argument concerning
punitive damages, and he invited the parties to submit final
arbitration award proposals. The arbitrator issued a final
arbitration order two months after the hearing.

The arbitrator concluded that PF Holdings and Schoolhouse
knew of poor conditions at The Ralston that posed serious dangers
to the health and safety of the residents. The arbitrator found
that the conditions were "unsafe and untenable," that The Ralston
lacked "necessary utilities for safe and habitable living" (like
heat in the winter and air conditioning in the summer), that
Claimants were "repeatedly wrongfully evicted from their
apartments," and that Claimants "were forced to share their
private living quarters with bedbugs, roaches and rats" due to
"Defendants' failure to perform any preventative or remedial pest
control." Defs.' Mot. for Summ. J. Ex. 41, Arbitration Award 10-

11, 13, ECF No. 67-43.   The arbitrator emphasized that the conditions were so bad that on one occasion The Ralston failed an inspection by the Department of Housing and Urban Development ("HUD") due to a mechanical failure of heating and hot water system.   *Id.* at 10.   The arbitrator concluded that despite its knowledge of the poor conditions at The Ralston, Schoolhouse, which controlled The Ralston's purse strings, intentionally took "millions of dollars away from 'The Ralston'" and gave the money to "organizations in New York and New Jersey" "instead of performing necessary maintenance and repairs" at The Ralston. *Id.* at 24.   The arbitrator further found that Schoolhouse acted with specific intent to cause harm to Claimants in allowing the living conditions at The Ralston to deteriorate significantly. *Id.*   In contrast, the arbitrator found that PF Holdings was merely negligent because PF Holdings lacked funding to make repairs.   As a factual matter, the arbitrator concluded that PF Holdings knew it needed to make repairs and tried to make repairs with used parts from vacant units, but it could not buy the parts necessary to perform meaningful repairs because Schoolhouse denied the funds.   Arbitration Award 24.

The arbitrator awarded Glaubius $2.5 million in compensatory damages against Schoolhouse and PF Holdings for 2018 damages, $4.5 million in compensatory damages against Schoolhouse and PF Holdings for 2019 damages, $3.5 million in attorneys' fees

against Schoolhouse and PF Holdings, and $21 million in punitive damages against Schoolhouse. *Id.* at 28. He awarded Hadley $1.5 million in compensatory damages against Schoolhouse and PF Holdings for 2018 damages, $3.5 million in compensatory damages against Schoolhouse and PF Holdings for 2019 damages, $2.5 million in attorneys' fees against Schoolhouse and PF Holdings, and $15 million in punitive damages against Schoolhouse. *Id.* at 29. The arbitrator found PF Holdings and Schoolhouse jointly and severally liable for all damages except punitive damages. *Id.* at 28-29.

The day after Claimants received the arbitration award, they applied to the State Court of Muscogee County for a court order confirming the arbitration award. Crawford, on behalf of PF Holdings and Schoolhouse, stated in the confirmation application that Defendants agreed "that no grounds exist under O.C.G.A. § 9-9-13 to contest the Arbitrator's Final Award" and that Defendants thus did "not oppose confirmation of the Arbitrator's Final Award and the entry of Judgment thereon." Defs.' Resp. to HDI's Mot. for Summ. J. Ex. 3, Applications for Confirmation, ECF No. 75-5 at 9, 14. PF Holdings and Schoolhouse did not receive consent from the insurers to make this statement. Although Defendants pointed to evidence that Temesgen and Mize were kept apprised of the process of the arbitration up to the point that the arbitrator issued the final award, they did not point to any

26

evidence that either insurer knew about the application for an order confirming the award or received notice that PF Holdings and Schoolhouse affirmatively stated that they did not oppose confirmation.[8]  And, Temesgen testified that Crawford did not ask him to comment on the possibilities of objecting to the award and did not consult him regarding the decision not to oppose confirmation of the award.  Temesgen Dep. 111:20-112:16.  The morning after Claimants filed their confirmation application, the state court judge entered an order confirming the arbitration award, then entered judgment in favor of Claimants and against PF Holdings and Schoolhouse.

B.   Analysis

HDI argues that PF Holdings and Schoolhouse breached their duty of cooperation when they proceeded with the arbitration without its consent, selected an arbitrator without its input, hired their own lawyer to represent them in the arbitration, placed restrictions on the participation of lawyers hired by HDI to represent them, and failed to provide notice to or seek approval of HDI before consenting to the confirmation of the arbitration award.   HDI and National Union both argue that PF

---

[8] During Temesgen's deposition, counsel asked him to confirm that the confirmation applications were filed with the court between 4:20 p.m. and 4:27 p.m. on July 30, 2020.  Temesgen Dep. 111:8-14.  Neither side appears to have submitted the exhibit referenced for this testimony—Exhibit 122 to Temesgen's deposition.  The testimony does not establish when (or if) Temesgen or Mize received notice of the motion for confirmation.

Holdings and Schoolhouse violated their duty not to make a voluntary payment or assume an obligation when they agreed to proceed with binding arbitration and then failed to keep the insurers fully informed before the final judgment was issued.

To establish that an insured is not entitled to indemnification for failure to obtain the insurer's consent for a voluntary obligation or payment, there must have been a voluntary payment or assumption of an obligation. *Trinity Outdoor, LLC v. Cent. Mut. Ins. Co.*, 679 S.E.2d 10, 12 (Ga. 2009) (finding that insured's voluntary settlement payment without the insurer's contractual consent precluded the insured from pursuing a breach of contract claim against the insurer for failure to indemnify). And, "[t]o justify the denial of coverage for an insured's non-cooperation under Georgia law, the insurer must establish: '(a) that it reasonably requested the insured's cooperation in defending against the plaintiff's claim, (b) that its insured wilfully and intentionally failed to cooperate, and (c) that the insured's failure to cooperate prejudiced the insurer's defense of the claim.'" *Travelers Home & Marine Ins. Co. v. Castellanos*, 773 S.E.2d 184, 186-87 (Ga. 2015) (quoting *Vaughan v. ACCC Ins. Co.*, 725 S.E.2d 855, 858 (Ga. Ct. App. 2012)).

Neither PF Holdings nor Schoolhouse made a voluntary payment to Claimants as part of a pre-judgment settlement. But they did commit to binding arbitration, which would result in an

arbitration award that could only be modified under limited circumstances as provided by statute and then be reduced to a judgment that PF Holdings and Schoolhouse would be obligated to pay. Thus, by agreeing to binding arbitration, PF Holdings and Schoolhouse assumed a legal duty to pay a judgment based on the arbitrator's award and acknowledged a liability to pay a certain amount as determined by the arbitrator. The Court is thus satisfied that by agreeing to binding arbitration with a single arbitrator under these circumstances, PF Holdings and Schoolhouse assumed an obligation within the meaning of the policies. *See Obligation*, Black's Law Dictionary (11th ed. 2019) (defining an obligation as "A legal or moral duty to do or not to do something" and "A formal, binding agreement or acknowledgement of a liability to pay a certain amount or do a certain thing for a particular person or set of persons"). And Defendants did not point to any evidence that HDI or National Union consented to this obligation. In fact, as previously discussed, PF Holdings and Schoolhouse never sought consent from HDI because they were traveling under the assumption that HDI had waived its right to insist upon this policy duty based on its alleged failure to defend.

Similarly, HDI has established that PF Holdings and Schoolhouse failed to cooperate with HDI in the defense of the claims. They agreed to binding arbitration with a single

arbitrator without any input from HDI. Although an adjuster
observed generally that arbitration may be preferable to a jury
trial, those general observations certainly did not suggest that
HDI was deferring completely to PF Holdings and Schoolhouse's
privately retained counsel as to the logistics of those
proceedings and particularly who would constitute the jury of
one. Moreover, by restricting the counsel hired by HDI to
represent PF Holdings and Schoolhouse to the sidelines during the
arbitration hearing, PF Holdings and Schoolhouse clearly failed
to cooperate. Allowing them to chip in with a few questions here
and there and provide suggestions as to trial strategy is not the
type of full cooperation contemplated by the policy. Finally,
signing off on the final award with no objection and with no
opportunity for input by HDI's retained counsel certainly
demonstrates an intentional refusal to cooperate. Again, these
issues are not hotly contested. PF Holdings and Schoolhouse did
not believe they had any duty to cooperate because of their
mistaken belief that HDI had denied them a defense. Thus, the
conduct here, which clearly demonstrates a lack of cooperation,
is entirely consistent with this mistaken assumption.

Finally, the Court finds that this lack of cooperation
prejudiced HDI. It was forced to accept arbitration by a single
arbitrator with no input on his selection. And by having its
hired counsel relegated to the sidelines in the role of observer

instead of active advocate, HDI lost the opportunity to meaningfully impact the arbitration, including objecting to the arbitration award before it was confirmed.

Looking at the big picture, PF Holdings and Schoolhouse essentially declined HDI's offer to defend them because they felt it had come too late. Because it did not come too late, their declination of it, which resulted in a failure to cooperate with HDI and a decision to bind HDI and National Union to liability without their consent, amounted to a breach of their duties under the policies. Thus, they forfeited coverage under the policies for the arbitration judgment, unless HDI waived its right to insist on compliance with those policy provisions.[9]

## III. Did HDI Waive Cooperation and Assumption of Liability Without Consent?

As the Court has previously explained, HDI did not breach its duty to provide a defense in the underlying action to PF Holdings or Schoolhouse. Thus, it did not waive its right to insist upon PF Holdings and Schoolhouse complying with their duties under the policy, unless other conduct by HDI amounts to waiver.

Defendants argue that HDI waived both its right to insist on cooperation and its right to refuse consent for the binding arbitration because HDI's counsel and adjuster thought that

---

[9] There is no evidence that National Union waived any policy conditions.

arbitration was better than a jury trial given the venue.  *See* Temesgen Dep. 117:22-118:4 (agreeing that "generally speaking, arbitration beats a jury trial in Muscogee County"); *accord* Email from P. Temesgen to J. Moudy (May 4, 2020, 2:04 PM), ECF No. 67-57 (noting that counsel and HDI's adjuster generally agreed "that arbitration is better than a jury trial in this case given certain considerations – including the venue and the presiding judge").[10]   This slender reed does not support waiver.   To establish waiver of a policy condition, there must be an "affirmative promise or other act waiving the" relevant condition.  *Bowers v. Safeco Ins. Co. of Am.*, 369 S.E.2d 547, 548 (Ga. Ct. App. 1988).   HDI did not affirmatively consent to an arbitration with a single arbitrator whom it had no input in choosing; nor did it consent to playing a limited role in the arbitration proceedings, essentially banished to the sidelines. Privately retained counsel for PF Holdings and Schoolhouse candidly acknowledges that he did not give a great deal of thought to whether HDI protested proceeding with the arbitration, presumably because he was convinced that it had waived its right

---

[10] Defendants also argue that they were led to believe that HDI agreed with the plan to participate in arbitration.   In support of this argument, Defendants cite a file memo (which they did not receive) referencing Mize's plan "to attempt to get involved as much as possible for the arbitration."  Temesgen Dep. Ex. 94, Email from D. Mize to D. Mize (Apr. 7, 2020, 2:45 PM), ECF No. 94-27.  When Mize authored this file memo, he believed that Crawford would allow him to help with the arbitration.  *Id.*  Later, though, Mize and Temesgen learned that they would not be permitted to take an active role in the arbitration.

to protest by denying his clients a defense.   Counsel hired by HDI to represent PF Holdings and Schoolhouse clearly recalls that HDI never consented to the arbitration proceeding in the manner that it proceeded.   Moreover, on the Thursday before the Monday arbitration trial, HDI filed this declaratory judgment action, alleging that appointed counsel had objected to the arbitration, that Crawford intended to proceed with the arbitration, and that it had no duty to indemnify the additional insureds because they breached the duty to cooperate and the duty not to assume an obligation by moving ahead with the arbitration.   These actions do not suggest that HDI had any intent to waive the contractual duties under the policies.   To the contrary, they establish just the opposite.[11]

The insureds nevertheless charged forward, apparently believing that HDI had waived its rights to insist upon their compliance with the policy terms because they believed (wrongly, as it turns out) that HDI had breached its duty to defend them. Thus, they presumably thought that HDI would be on the hook for any arbitration award, with its participation limited by whatever

---

[11] The declaratory judgment complaint in this action makes it clear that HDI did not consent to the arbitration going forward and that it objected to the insureds' failure to cooperate.   Defendants were notified on March 30, 2020 that HDI intended to file a declaratory judgment action.   Defs.' Mot. for Summ. J. Ex. 40, Letter from P. Fields to J. Crawford (Mar. 30, 2020), ECF No. 67-42 at 2.   And Defendants received notice of the declaratory judgment action on May 14, 2020—before the arbitration hearing.

grace the insureds' privately retained counsel decided to gratuitously grant them.

Because HDI did not breach its duty to provide a defense to PF Holdings and Schoolhouse and because it otherwise did not waive its right to insist upon their compliance with the duties clearly stated in the policy, PF Holdings and Schoolhouse's breach of their duties under the policies, as previously described, results in no coverage for the underlying arbitration judgment. HDI and National Union's motions for summary judgment are granted and Defendants' motion denied on the coverage issue.[12]

**IV. Did the Insurers Reject the Settlement Demands In Bad Faith?**

Separate and apart from the coverage issues raised by their declaratory judgment claims, HDI and National also seek summary judgment on Claimants claims for negligent or bad faith failure to settle.[13] Claimants contend that both HDI and National Union wrongfully rejected or failed to respond to Claimants' offers to settle and that these failures were a proximate cause of the excess judgment against PF Holdings and Schoolhouse. The insurers assert that they responded reasonably to Claimants'

---

[12] To avoid future confusion, the Court emphasizes that its ruling today is restricted to coverage for the judgment entered on the arbitration award. Today's ruling should not be interpreted to take any position, implied or otherwise, as to whether coverage would exist for the claims asserted in the underlying state court action if the previous judgment were somehow vacated by the state court.

[13] Claimants assert these claims as assignees of the insureds; the Ralston Entities assigned Claimants all their assignable rights and claims against the insurers, including claims for failure to settle.

settlement demands and that they are entitled to summary judgment on this issue. Claimants argue that genuine fact disputes preclude summary judgment.

A.   Relevant Facts

On October 28, 2019, Claimants' counsel sent a "Notice of Claim/Pre-Suit Demand For Relief" to HDI and National Union. Am. Compl. Ex. E, Letter from C. Gower to Int'l Ins. Co. of Hannover SE, *et al.* at 1 (Oct. 28, 2019), ECF No. 48-5. The letter enclosed demands for each Claimant. The letter provided a December 6, 2019 deadline for the insurers to respond to the demands. *Id.* at 2. Both demands stated that the Ralston was not properly maintained or repaired despite repeated promises, that the Claimants were "victims of roach and bed bug infestations" caused by the failure to maintain the premises, and that the air conditioning and heating systems in the Claimants' apartments were not functional. *Id.* Attach. 1, Letter from C. Gower to C. Puretz, *et al.* (Sept. 9, 2019), ECF No. 48-5 at 4-6 ("Glaubius Sept. 2019 Demand"); *id.* Attach. 2, Letter from C. Gower to C. Puretz, *et al.* (Sept. 25, 2019), ECF No. 48-5 at 10-12 ("Hadley Sept. 2019 Demand").

The demands stated that Claimants "did not have properly functioning heat or hot water" in their apartments in January 2018 and that they "became physically sick" as a result. Glaubius Sept. 2019 Demand at 2; Hadley Sept. 2019 Demand at 2.

Hadley's demand further stated that Hadley became "injured" and was "constructively evicted" from his apartment because of the lack of heat and hot water.  Hadley Sept. 2019 Demand at 2.  The Glaubius Demand stated that Glaubius would "agree to settle" her claim for $2.5 million, and the Hadley Demand stated that Hadley would "agree to settle" his claim for $1 million.[14]  Glaubius Sept. 2019 Demand at 2; Hadley Sept. 2019 Demand at 2.  The Demands did not include any other details about the Claimants' injuries, such as the severity of their injuries, the treatment they received, or medical records.

HDI's adjuster sent a letter to Claimants' counsel on November 5, 2019 requesting an opportunity to obtain statements from Claimants, asking Claimants' counsel to send Claimants' medical records, and telling Claimants' counsel she wanted to learn more about Claimants' injuries and theory of liability. Defs.' Mot. for Summ. J. Ex. 43, Letter from V. Goldin to C. Gower (Nov. 5, 2019), ECF No. 67-45.  Claimants' counsel did not respond to these requests.  After HDI appointed Wolff as defense counsel for PF Ralston and Ralston GA, he contacted Claimants' counsel asking for a computation of actual damages so he could

---

[14] Both HDI policies had the following limits of insurance: (1) Each Occurrence Limit: $1,000,000, (2) Personal & Advertising Injury Limit: $1,000,000, (3) General Aggregate Limit: $2,000,000.  2017-2018 HDI Policy Form CG DS 01 10 01 Commercial General Liability Declarations, ECF No. 48-1 at 11.

evaluate the Claimants' claims.   There is no evidence that Claimants' counsel responded to that request.

The December 6, 2019 deadline passed, and Claimants filed civil actions against all four Ralston entities.   The complaints alleged poor living conditions at The Ralston for years.   They alleged that after The Ralston failed a HUD inspection because of a mechanical failure of the heating and hot water systems, the City of Columbus declared portions of The Ralston unsafe for human occupancy and HUD made The Ralston provide motel rooms for residents who did not have heat or hot water.   According to the complaints, the displaced residents—including Claimants—were sent to a motel, but they were told two days later that The Ralston's owners would not pay for any more nights at the motel, so they had to leave.   The Claimants alleged that the buses do not run in Columbus on Sundays, so Claimants had to walk 3.3 miles back to The Ralston in the cold and that as a result Hadley "got sick and sustained injuries to his leg" and Glaubius "got sick and sustained injuries."   Hadley Compl. ¶ 78; Glaubius Compl. ¶ 78. Claimants also allege that they suffered from bed bug bites. Hadley Compl. ¶ 150; Glaubius Compl. ¶ 151.   Claimants pointed to no specific allegations regarding the nature of their physical injuries or any medical treatment Claimants obtained.

Claimants' counsel issued new settlement offers to HDI, copying Wolff and Crawford, on February 7, 2020.   Hadley offered

to settle with all four Ralston Entities for $2.5 million, and Glaubius offered to settle for $4.5 million. Defs.' Mot. for Summ. J. Ex. 23, Letter from C. Gower to V. Goldin (Feb. 7, 2020), ECF No. 67-25 at 2-3 ("Hadley Feb. 2020 Demand"); Defs.' Mot. for Summ. J. Ex. 23, Letter from C. Gower to V. Goldin (Feb. 7, 2020), ECF No. 67-25 at 4-6 ("Glaubius Feb. 2020 Demand"). Counsel highlighted the allegations in Claimants' complaints regarding the January 2018 mechanical failure of the heating and hot water systems, the displacement of Claimants to a motel, their removal from the motel, and their 3.3 mile walk in the cold back to their apartments that still did not have heat or hot water. Hadley Feb. 2020 Demand at 2; Glaubius Feb. 2020 Demand at 2. Counsel also noted that Hadley "got sick and sustained injuries to his leg" when he had to walk from the motel back to The Ralston and that Glaubius "became physically sick" due to the lack of heat and hot water in January 2018 and that "she got sick and sustained injuries" when she had to walk from the motel back to the Ralston. Hadley Feb. 2020 Demand at 2; Glaubius Feb. 2020 Demand at 2. Counsel also referenced a $125 million dollar judgment his firm obtained against the Ralston Entities in the wrongful death action regarding Charles Hart, who died in 2017 from heat-related causes when his apartment's air conditioning failed. The deadline for both settlement demands was February 24, 2020.

38

Crawford emailed the HDI adjuster about the February 7 settlement demands on behalf of PF Holdings and Schoolhouse, and he asked that the insurer accept the settlement offers "in light of the underlying facts in the cases, the venue, as well as the history in Muscogee County State Court experienced by [PF Holdings and Schoolhouse] in front of a Muscogee County jury." Defs.' Mot. for Summ. J. Ex. 24, Email from J. Crawford to V. Goldin (Feb. 10, 2020, 10:48 AM), ECF No. 67-26. Claimants' counsel later sent HDI and National Union a letter stating that he sent offers to settle Claimants' claims on February 7, noting that the offers were "within the combined policy limits" of HDI and National Union. Defs.' Mot. for Summ. J. Ex. 57, Letter from C. Gower to V. Goldin, *et al.* (Feb. 13, 2020), ECF No. 67-59. Though the letter enclosed the Glaubius demand, Defendants pointed to no evidence that Hadley's February 7, 2020 demand was also sent to National Union.

A new adjuster took over as the HDI adjuster for Claimants' claims on February 14, 2020. He spoke with Claimants' counsel that day to learn more about the claims and seek additional time to respond to the settlement demands. Claimants' counsel explained that the main claim was the constructive eviction claim based on the unpredictable heating and cooling, the problems with vermin, and the fear of having the electricity and water cut off because the landlord failed to pay the bills on time. After

speaking with Claimants' counsel, the adjuster asked HDI to approve appointing coverage counsel to review coverage and the settlement demands.   Defs.' Mot. for Summ. J. Ex. 25, Email from K. Skinner to C. Trenkel (Feb. 14, 2020, 10:17 PM), ECF No. 67-27.   The adjuster also told HDI that defense counsel had advised "that the property manager first hand admits that all of the allegations listed to the complaints are true. She allegedly is of the belief that the insureds are not good people and summarily quit within a few weeks later. She is a potential witness number one to the trial in this matter." *Id.*   The adjuster noted, "It's not that potential compensable damages would be driving this matter – it's more about having to defend the insured and their potential action's [sic] that . . . is driving a potential value on this case.   We probably won't be able to get an equitable trial in this venue[.]"   *Id.*   The adjuster was particularly concerned about punitive damages given The Ralston's "notoriety." *Id.*; *accord* Skinner Dep. 56:22-24, ECF No. 67-54.   Shortly after that, the reserves for each claim were increased to $250,000. *Id.* at 94:4—7.   Claimants' counsel sent the entire transcript of the Hart case to the Adjuster.[15]

---

[15] The parties did not point the Court to specific parts of that transcript other than the testimony by Hadley and Glaubius, who testified about maintenance issues at The Ralston and issues in Mr. Hart's apartment but did not testify about their own physical injuries or illnesses.

By letter from its lawyer, HDI rejected the demands because neither settlement demand provided "sufficient information regarding the nature or extent of [Claimants'] claimed injuries and damages." Defs.' Mot. for Summ. J. Ex. 31, Letter from P. Fields to C. Gower 1 (Feb. 24, 2020), ECF No. 67-33. The letter also stated that Claimants had not provided "information and documents substantiating or reflecting any damages claimed by" Claimants and that "no information about the nature or extent of [Claimants'] alleged injuries and medical treatment" had been provided. *Id.* And the letter said that the demands provided no basis for calculating damages or an explanation for the amounts sought. *Id.* at 1-2. HDI's lawyer invited Claimants' counsel to provide medical records and bills, as well as a substantiated explanation of Claimants' claimed damages. *Id.* at 3.

B.  Analysis

"An insurance company may be liable for the excess judgment entered against its insured based on the insurer's bad faith or negligent refusal to settle a personal claim within the policy limits." *First Acceptance Ins. Co. of Ga., Inc. v. Hughes*, 826 S.E.2d 71, 74 (Ga. 2019) (quoting *Cotton States Mut. Ins. Co. v. Brightman*, 580 S.E.2d 519, 521 (Ga. 2003)). A claim for failure to settle "asserts extra-contractual liability and sounds in tort." *GEICO Indem. Co. v. Whiteside*, 857 S.E.2d 654, 661 (Ga. 2021). An "insured may sue the insurer for failure to settle

only when the insurer had a duty to settle the case, breached that duty, and its breach proximately caused damage to the insured beyond the damages, if any, contemplated by the insurance contract." *Id.* at 661-62 (quoting *Delancy v. St. Paul Fire & Marine Ins. Co.*, 947 F.2d 1536, 1546-47 (11th Cir. 1991)). "[T]he unreasonableness of the insurer's conduct is at the heart of a negligent or bad faith failure-to-settle claim, and the reasonableness of the insurer's actions or decisions must be judged at the time they were taken or made." *Id.* at 661. "An insurer has no affirmative duty 'to engage in negotiations concerning a settlement demand that is in excess of the insurance policy's limits.'" *Baker v. Huff*, 747 S.E.2d 1, 6 (Ga. Ct. App. 2013) (quoting *Brightman*, 580 S.E.2d at 522).

"To find that the insurer acted unreasonably in declining to accept a time-limited settlement offer, the facts must be sufficient to permit a jury to find that no ordinarily prudent insurer would have declined to accept the offer." *Baker*, 747 S.E.2d at 6. This is normally a jury question "requiring consideration of all the relevant circumstances including the insurer's knowledge of facts relevant to liability and damages on the claim; the insurer's diligence in conducting a reasonable investigation to discover the relevant facts; and the terms of the settlement offer and any response by the insurer." *Id.* But if "there is no basis in the record for a jury to find that" an

insurer's "failure to accept a settlement offer within the deadline was unreasonable," then the insurer is entitled to summary judgment on a failure-to-settle claim. *Id.* at 8.

In *Baker*, for example, the insurer failed to accept the injured party's time-limited offer to settle for the $100,000 policy limits. There was no question of liability, but there was a question of damages. The insurer knew from the injured party's medical records that the injured party had a broken arm, a cerebral contusion, and medical bills of $35,000. The insurer also knew from the injured party's medical records that the injured party's arm had healed and that the after-effects of the cerebral contusion had improved. When the injured party's lawyer made a time-limited settlement demand, he did not include any additional medical records, did not know if the injured party was still receiving medical treatment, and made no statement about special or other damages. The lawyer also revoked the medical authorization previously given by the injured party and refused access to the injured party. Although the insurer asked for more information, none was provided and the insurer thus had no additional information to value the injured party's impairment. The insurer informed the injured party's lawyer that it needed additional information to determine whether the injured party's impairment had a value that justified tendering the $100,000 policy limits. The Georgia Court of Appeals concluded that the

insurer "acted reasonably under the circumstances by informing [the injured party's lawyer] that it was not prepared, without more information, to tender the $100,000 policy limits to settle the claim." *Id.*

Here, Claimants contend that a jury could find that no ordinarily prudent insurer would have declined to accept any of their offers to settle. The Court disagrees. Although the insurers likely had enough information to determine that PF Holdings and Schoolhouse were liable for the negligence and breach of the implied warranty of habitability claims, they did not have any specific information on damages.

In the October 2019 demand letters to HDI and National Union, Glaubius sought $2.5 million and Hadley sought $1 million, but they provided very few facts. Claimants asserted that The Ralston was not properly maintained, that they had suffered roach and bed bug infestations, that the heating and air conditioning systems in the building malfunctioned, and that they were displaced from their apartments on one occasion due to lack of heat and hot water. Claimants said they got sick because of the lack of heat and hot water in January 2018, but they provided no details regarding the severity of their injuries, the treatment they received, or the details and frequency of problems in The Ralston. They did send transcript excerpts from the trial regarding the death of Charles Hart, but those excerpts did not

include information about Claimants' injuries. In response, HDI's adjuster asked Puretz for background information and reviewed information about the Hart trial. She asked Claimants' counsel to send Claimants' medical records and allow her to obtain statements from Claimants, and she informed Claimants' counsel that she wanted to learn more about Claimants' theory of liability, injuries, and damages. Finally, appointed counsel for PF Ralston and Ralston GA asked for a computation of actual damage so he could evaluate Claimants' claims. Claimants pointed to no evidence that they provided any additional information regarding their injuries in response to the requests from HDI's adjuster and the Ralston Entities' counsel.

In summary, the October 2019 settlement offers demanded millions of dollars but provided no medical records and no specifics about the nature and extent of the Claimants' injuries or the frequency, duration, and effect of maintenance problems in The Ralston. Claimants did not respond to requests from the adjuster or appointed counsel for more information about damages. Claimants offered no concrete explanation to substantiate the value they assigned to their claims—nothing to show that Claimants' injuries justified tendering the per-occurrence policy limits for both policy years to settle Glaubius's claims or justified tendering $1 million to settle Hadley's claims. Under these circumstances, the Court cannot find any basis in the

record to conclude that HDI's failure to accept the October 28, 2019 settlement offers by the December 6, 2019 deadline was unreasonable.  Claimants pointed to no authority that an excess carrier in National Union's position has a duty to make a tender under these circumstances, where there is no indication that the primary policy limits will be exhausted.

The February 7, 2020 settlement demands, like the October 2019 demands, were short on facts and devoid of any medical records or other documentation to support Claimants' demands, which increased to $4.5 million for Glaubius and $2.5 million for Hadley.  The February 2020 demands provided slightly more detail about Claimants' injuries than the October 2019 demands did, but not much.  Both demands emphasized that Claimants were constructively evicted from their apartments in January 2018, then displaced from the motel due to lack of payment.  Both demands stated that Claimants got sick and suffered unspecified injuries when they had to walk from the motel to The Ralston. They again referred to the verdict in the Charles Hart wrongful death case.  In response to the demands, HDI's adjuster spoke with Claimants' counsel to learn more about the claims and seek additional time to respond to the demands.  He also asked for an opportunity to mediate the case, which Claimants' counsel declined.  Claimants' counsel explained that the main claim was the constructive eviction claim based on the unpredictable

heating and cooling, the problems with vermin, and the fear of having the electricity and water cut off because the landlord failed to pay the bills on time.  The adjuster concluded that the case's value was driven by the potential for punitive damages, not actual damages suffered by Claimants.  HDI's counsel determined that because Claimants had not provided sufficient information about the nature or extent of their injuries and damages, HDI could not effectively consider the demands and thus rejected them.

The February 2020 settlement offers demanded millions of dollars but provided no medical records and few specifics about the nature and extent of the Claimants' injuries or the frequency, duration, and effect of maintenance problems in The Ralston.  When HDI's adjuster followed up with Claimants' counsel to learn more about the claims, few additional details were provided.  If the adjuster or counsel for the Ralston entities had interviewed Claimants, they likely would not have learned any more than was disclosed at the arbitration, which provided a few new details about the vermin problems and the distress they caused Glaubius and Hadley, the injuries Glaubius and Hadley developed on their January 2018 walk back to The Ralston (all of which were treated with over-the-counter treatments), and a second eviction/motel incident.

Based on these facts, the Court finds that no reasonable juror could conclude that the failure to tender the substantial policy limits under the circumstances here amounted to a bad faith or negligent failure to settle these claims. Furthermore, Claimants pointed to no authority that an excess carrier in National Union's position has a duty to make a tender under these circumstances, where there was no evidence that the primary policy limits would be exhausted and where it did not even receive a settlement demand from Hadley.[16]

HDI and National Union are entitled to summary judgment on the failure-to-settle claims. And since Defendants' claims for attorneys' fees and litigation expenses under O.C.G.A. § 13-6-11 are premised on the failure-to-settle claims, HDI and National Union are entitled to summary judgment on these claims, as well.

CONCLUSION

For the reasons explained in this order, the Court (1)grants HDI's summary judgment motion (ECF No. 69) as to Defendants' counterclaim that HDI breached its duty to defend PF Holdings and

---

[16] Claimants do argue that National Union should have known that HDI was not providing a defense and that it should have acted to protect the insureds, but as discussed above, HDI did not ultimately deny a defense to PF Holdings or Schoolhouse. Claimants also point to an affidavit from its expert stating that National Union should have settled Claimants' claims. Knowe Aff. ¶ 6, ECF No. 74-11. That affidavit misstates critical facts regarding National Union's knowledge and does not explain why the facts available to the insurers justified a settlement exceeding the primary insurer's policy limits. Accordingly, the affidavit does not create a genuine fact dispute on the failure-to-settle claim against National Union.

Schoolhouse; (2) grants both insurers' summary judgment motions (ECF Nos. 68 & 69) on their claim for a declaration that they have no duty to indemnify PF Holdings or Schoolhouse for the arbitration judgment because those insureds breached their duties to cooperate and not to undertake an obligation without the insurers' consent; (3) grants both insurers' summary judgment on Claimants' failure-to-settle claims and Defendants' related claims under O.C.G.A. § 13-6-11; and (4) denies Defendants' summary judgment motion (ECF No. 67).  National Union's motion to exclude the affidavit of Peter Knowe (ECF No. 84) is terminated as moot.  Having disposed of all the claims in this action, the Clerk is directed to enter final judgment in favor of Plaintiff and Counterclaim Defendant HDI Global Specialty SE and in favor of Third-Party Defendant National Union Fire Insurance Company of Pittsburgh, PA.

IT IS SO ORDERED, this 18th day of May, 2022.

S/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA